UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    X

UNITED STATES OF AMERICA,                          :

        Plaintiff,                                  :
                                                    09-cr-656-02 (SDW)
                    vs.                             :

JOHN A. BENNETT,                                   :

        Defendant.                                 :

                                                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOHN A. BENNETT'S MOTION FOR A BILL OF PARTICULARS AND FOR *BRADY* MATERIAL

MORVILLO, ABRAMOWITZ, GRAND,
IASON & ANELLO, P.C.
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
(212) 856-9494 (facsimile)

*Attorneys for Defendant John A. Bennett*

# TABLE OF CONTENTS

**Page**

BACKGROUND ...................................................................................................... 2

   I.    Defendant's Request for Particulars ............................................................ 4

   II.   Defendant's Request for Discovery ........................................................... 5

DISCUSSION .......................................................................................................... 6

   I.    The Government Should Be Ordered to Provide a Bill of Particulars
       Identifying the Essence of Its Charges Against John Bennett: The Alleged
       False Statements.................................................................................. 6

       a.  Fairness Requires that the Government Identify the Claimed False
          Statements That It Intends to Prove at Trial……..……………………………..8

       b.  The Massive Volume of Discovery Heightens Defendant's Need for
          A Bill of Particulars……………………………………………………………...11

   II.    The Government Should be Directed to Make Immediate Disclosure
       of *Brady* Material........................................................................... 13

CONCLUSION....................................................................................................... 19

## **TABLE OF AUTHORITIES**

### **Cases**

*Brady v. Maryland*, 373 U.S. 83 (1963) ...............................................................*Passim*

*Breakiron v. Horn*, 642 F.3d 126 (3d Cir. 2011) ...........................................17

*Dennis v. United States*, 384 U.S. 855 (1966) ...............................................8

*United States v. Addonizio*, 451 F.2d 49 (3d Cir. 1971) ................................7

*United States v. Agnello*, 367 F. Supp. 444 (E.D.N.Y. 1973)........................7

*United States v. Bin Laden*, 92 F. Supp. 2d 225 (S.D.N.Y. 2000)................12

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1980) ......................7, 12

*United States v. Crozzoli*, 698 F. Supp. 430 (E.D.N.Y. 1988)......................16

*United States v. Donis*, No. 11-cr-251,
    2012 WL 3527277 (W.D. Pa. Aug. 15, 2012) ...........................................16

*United States v. Gatto*, 746 F. Supp. 432 (D.N.J. 1990)................................8

*United States v. Lacerda*, No. 12-cr-303 (NLH),
    2013 WL 3146835 (D.N.J. June 19, 2013) ...............................................11

*United States v. Lightfoot,* No. 08-cr-127,
    2008 WL 3050300 (W.D. Pa. Aug. 5, 2005) .............................................16

*United States v. Manetti*, 323 F. Supp. 683 (D. Del. 1971) ......................7, 8

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ...............12

*United States v. Nomura Trading Co.*, 213 F. Supp. 704 (S.D.N.Y. 1963)....9

*United States v. Palmisano*, 273 F. Supp. 750 (E.D. Pa. 1967)....................11

*United States v. Pellot*, 43 F. App'x 473 (3d Cir. 2002) ..............................17

*United States v. Recognition Equip., Inc.*, 711 F. Supp. 1 (D.D.C. 1989)......9

*United States v. Rittweger*, 524 F.3d 171 (2d Cir. 2008)..............................17

*United States v. Rogers*, 617 F. Supp. 1024 (D. Colo. 1985) ........................7

iii

*United States. v. Roque*, No. 12-cr-540 (KM),
2013 WL 2474686 (D.N.J. June 6, 2013) ...................................................7

*United States v. Rosa*, 891 F.2d 1063 (3d Cir. 1989) ...................................7

*United States v. Siddiqui*, No. 06-cr-377,
2007 WL 549420 (S.D.N.Y. Feb. 21, 2007)...........................................8

*United States v. Thomas*, No. 06-cr-553,
2006 WL 3095956 (D.N.J. Oct. 30, 2006)...........................................16

*United States v. Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998) ........................8, 9, 13

*United States v. Tucker*, 262 F. Supp. 305 (S.D.N.Y. 1966) .......................7

*United States v. Vastola*, 670 F. Supp. 1244 (D.N.J. 1987)...........................11

*United States v. Williams*, 504 U.S. 36 (1992) ........................................9

*United States v. Yetman*, 196 F. Supp. 569 (D. Conn. 1961)...........................9

## Statutes and Other Authorities

Federal Rules of Criminal Procedure, Rule 7(f) .......................................1, 7

Federal Rules of Criminal Procedure, Rule 16 ..........................................7

David W. Ogden, Deputy Attorney General, U.S. Dep't of Justice,
*Memorandum for Department Prosecutors: Guidance for Prosecutors
Regarding Criminal Discovery* (Jan. 4, 2010) ..................................16, 17

Defendant John A. Bennett respectfully submits this memorandum of law in support of his motion for a bill of particulars pursuant Rule 7(f) of the Federal Rules of Criminal Procedure, and for immediate production of materials to which he is entitled pursuant *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Specifically, Mr. Bennett seeks an order directing the government (a) to provide a bill of particulars specifying the false statements it contends were made in furtherance of the charges alleged in the indictment and how the statements were false; and (b) to undertake a thorough review of its file and to provide forthwith all *Brady* material, including but not limited to all relevant information regarding the concession, made by its special agent in a sworn statement filed in Canada (but which the government has never produced to the defense) that the government's key cooperating witness, Robert Griffiths, admitted that he concealed from Mr. Bennett that the company that Griffiths allegedly used to funnel improper payments to Gordon McDonald, General Monitoring and Environmental Control, Inc. ("GMEC"), was in fact a shell company controlled by McDonald..

As detailed in a separate letter regarding the status of discovery that we are submitting to the Court today, discovery in this case is vast, and includes at least 500,000 electronic files, as well as hundreds of boxes of hard-copy documents.  The government is continuing to produce discovery, and we have not finished reviewing the discovery that has been produced to date. Although other issues, described in further detail in our separately-filed letter, have arisen between the parties during the government's production of discovery, recent discussions between the parties now appear to have resolved those issues.  To avoid unnecessarily burdening the Court, we are not seeking relief from the Court on those matters at this time, with the understanding that we may seek the Court's intervention in the future should it become necessary.

## BACKGROUND

This case arises out of environmental cleanup work performed by Bennett Environmental Inc. ("BEI") at the Federal Creosote Superfund site in Manville, New Jersey over a decade ago, from late 2001 until August 2004. John Bennett, the self-made son of a Welsh electrician and the inventor of record on 15 patents for environmental cleanup-related equipment and processes, is the founder of BEI. Mr. Bennett formed BEI in 1992 to treat contaminated soil using a state-of-the-art proprietary thermal treatment process that he developed and refined. He served as CEO of BEI until approximately February 2004. The company, which was publicly traded on stock exchanges in Canada and the United States, became involved in dozens of environmental remediation projects in the United States and abroad, including one project that is the subject of the indictment in this case, the Federal Creosote site.

The Federal Creosote site, as described in the indictment, was contaminated by the operation of a wood processing facility that treated railroad ties with coal tar creosote from approximately 1910 to the mid-1950s. Creosote is a wood preservative that the United States Environmental Protection Agency ("EPA") believes may cause skin irritation or respiratory problems. In the late 1990s, the EPA began to address the cleanup of the Federal Creosote site by contracting with the U.S. Army Corps of Engineers ("USACE") to oversee the remediation. USACE, in turn, hired Sevenson Environmental Services Inc. ("Sevenson")[1] to serve as prime contractor overseeing the Federal Creosote site. Sevenson, after seeking the consent of USACE, contracted with numerous subcontractors, including BEI, to perform remediation work on the

---

[1] Based on the government's Rule 16 discovery and its initial production of limited particulars dated March 17, 2015, defense counsel understand that the following terms in the indictment have the following meanings: "P-C" refers to Sevenson (the prime contractor on the Federal Creosote site), "Company-1" refers to GMEC, "Z.T." refers to Zul Tejpar, and "R.P.G." refers to Robert Griffiths.

site.  The specific work performed by BEI at the Federal Creosote site included transporting

thousands of tons of contaminated soil to Canada and treating that soil through extremely high-

temperature incineration.  The cleanup of the Federal Creosote site was fully completed in 2008,

and was, by all accounts, a technical success.[2]

On August 31, 2009, a grand jury returned a twelve-count indictment charging Mr.

Bennett, Gordon McDonald (one of the Sevenson employees with responsibility for the Federal

Creosote site), and James Haas (an employee of a different subcontractor), with various conduct

relating to the contract procurement process for the remediation of the Federal Creosote site.[3]

Only two of those counts are alleged against Mr. Bennett:  Count One of the indictment charges

Mr. Bennett and McDonald with a conspiracy to commit, *inter alia*, wire fraud and major fraud

against the United States.  Count Two of the indictment charges Mr. Bennett and McDonald with

major fraud against the United States.

The fraud-based charges against Mr. Bennett allege that a fraud was perpetrated against

the EPA in two principal ways:

- "McDONALD, BENNETT, [Zul Tejpar] and [Robert Griffiths] *fraudulently inflated* the
  amount of BEI's bid price for a subcontract without USACE's knowledge, consent or
  authorization.  This fraudulently inflated amount included kickbacks . . . plus an amount
  that BEI kept for itself."  Indictment, Count One, ¶ 13 (emphasis added).

- "McDONALD *fraudulently disclosed* the bid prices of other vendors to BEI before the
  sub-contracts were awarded by [Sevenson] without USACE's knowledge, consent, or

---

[2]  In March 2008, the EPA announced that the cleanup of the Federal Creosote site was complete
and that the EPA was "extremely proud that we have met our cleanup objectives in record
breaking time."  *See* EPA News Release, "Cleanup Completed at Federal Creosote Superfund
Site" (Mar. 7, 2008), *available at*
http://yosemite.epa.gov/opa/admpress.nsf/Press%20Releases%20from%20Region%202?OpenView.

[3] Certain charges against defendants McDonald and Haas involved matters unrelated to the
Federal Creosote site, including tax fraud, and obstruction.  Those charges are not relevant here.

authorization.  BENNETT, [Zul Tejpar] and [Robert Griffiths] then used their knowledge of the other vendors' bid prices to submit the highest possible BEI prices to [Sevenson] and still be awarded the sub-contracts.  As a result, BEI was awarded the sub-contracts at prices higher than it would have otherwise bid, causing the EPA to pay more for these sub-contracts than it otherwise would have if the [Federal Acquisition Regulations] requirements were followed."  *Id.* at ¶ 16. (emphasis added)

Notably, although a criminal fraud charge requires proof of either a misrepresentation or failure to disclose a material fact where a specific duty to disclose exists, the indictment does not identify what (if any) false statements were made, who made those statements, and in what respect the statements were inaccurate, nor, to the extent the indictment may rely on a failure to disclose theory, the specific omissions and the source of any duty to disclose.  The indictment's silence on these critical points leaves Mr. Bennett in an untenable position of having to prepare at trial to rebut an unknown falsehood by an unspecified speaker.  Critically, such silence also prevents him from identifying the government's theory of fraud so as to frame an appropriate pretrial motion to dismiss or Rule 29 motion during trial.

I.    **DEFENDANT'S REQUEST FOR PARTICULARS**

By letter dated March 3, 2015, counsel for Mr. Bennett made a formal request for particulars relating to the indictment.  *See* Ex. A.[4]  The specific requests asked the government to: (1) identify the "fraudulently inflated" bid prices referred to in the indictment, the manner of communication, and the respect in which each such communication was false or misleading; (2) identify the "false and fraudulent pretenses, representations and promises" referred to in the indictment, and the respect in which each such statement was false or misleading; (3) identify the disclosure of bid prices that was done "fraudulently," and specify the respect in which each such disclosure was fraudulent.  On March 17, 2015, the government provided what it characterized

---

[4] Citations in the form "Aff. ¶ __" and "Ex. __" refer to the paragraphs and exhibits, respectively, to the accompanying Declaration of Jacob Mermelstein in support of Defendants' Motion For a Bill of Particulars and For *Brady* Material.

as an "initial voluntary bill of particulars" identifying certain basic information such as the alleged victims of the offenses, the identities of unindicted co-conspirators, and the contracts that were affected by the charged conduct.  *See* Ex. B.  The government declined, however, to identify: (a) which false statements it intends to rely upon at trial; (b) the respect in which any of those statements are alleged to be false; or (c) the specific omissions and the source of any duty to disclose (to the extent the government's theory is non-disclosure), all on the basis that those requests sought "evidentiary detail regarding the government's case."  *Id.*

## II.    DEFENDANT'S REQUEST FOR DISCOVERY

By letter dated February 28, 2015, counsel for Mr. Bennett made a detailed formal request for various specific categories of discovery (the "February 2015 Discovery Request").  *See* Ex. C.  To date, the government has produced mountains of documents, including more than 500,000 electronic documents, and it is in the process of scanning hundreds of boxes of hard-copy documents that will be produced to the defense by approximately July 2015.  Notwithstanding its volume, the government's discovery thus far has been lacking in a number of respects, including omitting a number of key documents expressly requested by defense counsel.[5]  As set forth in our June 8, 2015 letter to the Court, the government has recently agreed to take steps to remedy these deficiencies.

---

[5] The government also has forced Mr. Bennett to expend needless time and resources to obtain the discovery to which he is entitled.  For instance, defense counsel were required to make five separate written requests to the government prior to the government agreeing to provide a copy of the application that the government filed with the District Court under 18 U.S.C. § 3292 to toll the statute of limitations, notwithstanding clear case law requiring the government to disclose such an application so that the defendant may challenge its adequacy, and the central importance of such application to evaluating whether a statute of limitations defense exists.  After months of unjustified refusal, on June 3, 2015 the government finally agreed to provide such application to defense counsel.

The government's discovery also has been chaotic, disordered, and not generally labeled in a manner usefully identifying the source and nature of the material produced. These defects have exacerbated the ambiguities inherent in the indictment. The government has acknowledged that its own electronic productions have been hampered by multiple technological issues and that the productions that it received from third parties were chaotic and disorganized. Aff. ¶ 6. In our own review of the produced documents, we have encountered numerous errors, including missing or mislabeled attachments, inconsistent metadata, defective load files, and re-use of a single Bates number on multiple distinct documents.

Even if the government's production had been logically organized and technologically sound, review of the vast discovery in this case – over 500,000 documents produced thus far – would be a daunting task. The technological defects and disorganization of the government's production, coupled with the lack of specificity in the charges against Mr. Bennett, have only exacerbated these problems.

## DISCUSSION

**I.** **THE GOVERNMENT SHOULD BE ORDERD TO PROVIDE A BILL OF PARTICULARS IDENTIFYING THE ESSENCE OF ITS CHARGES AGAINST JOHN BENNETT:  THE ALLEGED FALSE STATEMENTS**

The government should be directed to identify:

(1) Which false statements the government intends to rely upon at trial, when and by whom those statements were made, and the respect in which any of those statements are alleged to be false, and

(2) If the fraud charges are premised on non-disclosure, the specific omissions and the source of any duty to disclose.

Under Federal Rule of Criminal Procedure 7(f), "The court may direct the government to file a bill of particulars." The purposes and functions of a bill of particulars are: (1) to identify with sufficient particularity the nature of the charges pending against the accused, thereby

enabling him to prepare for trial; (2) to prevent unfair surprise; and (3) to permit the accused to interpose a plea of double jeopardy. *United States v. Addonizio*, 451 F.2d 49, 63-64 (3d Cir. 1971); *see also United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1980). When a bill of particulars would serve these purposes, the defendant is entitled to it "as of right," even though it requires "the furnishing of information which in other circumstances would not be required because [it would be] evidentiary in nature." *United States v. Agnello*, 367 F. Supp. 444, 449 (E.D.N.Y. 1973). Thus, "motions for a bill of particulars should be granted whenever an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial." *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989).

In 1966, Congress amended Rule 7(f) to eliminate the requirement that "cause" be shown before a bill of particulars may be ordered. This amendment was made specifically "to encourage a more liberal attitude by the courts toward bills of particulars." *Rosa*, 891 F.2d at 1066 (quoting Fed. R. Crim. P. 7, advisory committee's note to 1966 amendment). The amendment of Rule 7(f), grants the district court considerable discretion in determining whether to order a bill of particulars. Doubts as to whether particulars are necessary should be resolved in favor of a defendant; "[s]ince [a] defendant is presumed innocent . . . it cannot be assumed that he knows the particulars sought." *United States v. Tucker*, 262 F. Supp. 305, 307 (S.D.N.Y. 1966); *see also United States v. Rogers*, 617 F. Supp. 1024, 1028 (D. Colo. 1985) (the defendant must "be given the benefit of the doubt in gray areas" (quoting *United States. v. Manetti*, 323 F. Supp. 683, 697 (D. Del. 1971))); *United States. v. Roque*, No. 12-cr-540 (KM), 2013 WL 2474686, at *6 (D.N.J. June 6, 2013) (granting a bill of particulars and observing that "the class of cases in which a bill of particulars should, or may, be granted is broader than the class of cases

in which it must be granted").  The prosecution's reluctance to reveal its case "must yield to paramount public interest in affording the accused a reasonable foundation for mounting a defense." *Manetti*, 323 F. Supp. at 696.

### a. Fairness Requires that the Government Identify the Claimed False Statements That It Intends to Prove at Trial

Where a charged count is premised on false statements, fundamental fairness requires that the government particularize its charges by identifying the specific false statements alleged, and why those statements are allegedly false.  As explained in *United States v. Trie*:

> [A] defendant faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against . . . when the government knows precisely the statements on which it intends to rely and can easily provide the information.

21 F. Supp. 2d 7, 21-22 (D.D.C. 1998).

Because the government well knows which statements it will allege to have been deceptive, and who made those statements, it should not be permitted to ambush Mr. Bennett with that information at trial.  *See United States v. Siddiqui*, No. 06-cr-377, 2007 WL 549420, at *3 (S.D.N.Y. Feb. 21, 2007) ("[W]here defendants have prepared multiple statements or documents, the Government should specify which of these are being called into question, lest defendants be forced to review all of the statements or documents in order to prepare a defense of the veracity of each[.]"); *United States v. Gatto*, 746 F. Supp. 432, 477 (D.N.J. 1990) ("To the extent that the government is able to do so, the precise date and place of each event alleged in the indictment should be provided."), *rev'd on other grounds*, 924 F.2d 491 (3d Cir. 1991).

The importance of identifying specific deceptive statements is particularly acute in the context of a conspiracy charge because, as the Supreme Court has recognized, "a conspiracy case carries with it the inevitable risk of wrongful attribution of responsibility to one or more of the multiple defendants."  *Dennis v. United States*, 384 U.S. 855 (1966).  Thus, courts have

repeatedly required the government, in the context of a conspiracy, to particularize the false or deceptive statements that the government intends to rely on at trial. *See, e.g.*, *Trie*, 21 F. Supp. 2d at 21; *United States v. Recognition Equip., Inc*., 711 F. Supp. 1, 10 (D.D.C. 1989) (requiring the government to specify "the gist of the statements, concealment, and misrepresentations alleged" as well as "when and to whom these alleged statements, concealments, and misrepresentations were made"), *abrogated on other grounds by United States v. Williams*, 504 U.S. 36, 51-54 (1992); *United States v. Yetman*, 196 F. Supp. 569, 570 (D. Conn. 1961) (in conspiracy prosecution, requiring the government to specify what untrue statements it claimed were made by any defendants and coconspirators, and identify where and when such statements were made); *United States v. Nomura Trading Co*., 213 F. Supp. 704, 708 (S.D.N.Y. 1963) (ordering the government to furnish a copy of each "false and fraudulent document" and specify "in what respect it is claimed to be false and fraudulent").

Here, the government has failed to identify the critical components of the frauds charged: the false statements or omissions.  Indeed, Mr. Bennett cannot discern from the indictment whether the fraud charges are premised on false statements or omissions, whether a false statement (or omission) was made by Mr. Bennett himself, or whether the government seeks to hold Mr. Bennett liable for false statements (or omissions) made by others.  Given the lack of specifics in the indictment, the indirect relationship between BEI and the government – both compounded by the massive volume of discovery – Mr. Bennett is left to guess as to what false representations he is alleged to have made, omitted to make, or conspired with others to make. The universe of statements or omissions that the government could potentially seek to prove were deceptive is without apparent limits.

Putting aside the pejorative adjective "fraudulently" that is sprinkled throughout the indictment, it is far from clear from the indictment what the United States is alleging that John Bennett actually did (if anything) to deceive the EPA, when that conduct occurred, and why that conduct was deceptive. The events described in the indictment span multiple years, and include at least two prime contracts and seven distinct subcontracts, each of which entailed a vast number of revisions, clarifications, change orders, work orders, and daily contract-related correspondence. As noted, the volume of discovery material in this case is massive, consisting thus far of nearly 500,000 electronic documents and 550 bankers' boxes containing literally millions of pages. To prepare for trial, to avoid surprise, and to decide what to investigate (and equally important, what *not* to investigate), defense counsel need to know where in the haystack of discovery are located the needles of allegedly false statements. Given the enormous volume of discovery, the government should identify which particular documents or portions of documents the government intends to prove were false or deceptive. Defense counsel should not be forced to "spin wheels" and expend resources investigating facts that will not be the subject of proof at trial, nor forced to guess at the government's theory of how the EPA was deceived, and what role Mr. Bennett played in that alleged deception.

As an illustrative example, the indictment alleges that Sevenson was required to award sub-contracts to the bidder offering the "best value." Indictment, Count One, ¶ 6. Does the government intend to prove at trial that the EPA was deceived because BEI was *not* the bidder offering the "best value," and someone represented that to be the case? Who allegedly misrepresented that, and when? If that is the basis for the fraud charges, then Mr. Bennett is entitled to know it, so that he can prepare evidence that could either demonstrate that BEI did offer the "best value" as compared with other competitors, or establish that the document that

contained the alleged misrepresentation was not known to Mr. Bennett, or whatever else the applicable defense might be.  Given the number of potential witnesses, the potential volume of evidence, and the fact that expert testimony may be required, substantial advance notice would be required in order adequately to prepare a defense of that potential government theory.  On the other hand, if the government does not intend to prove that "best value" was a false representation, then there is no need for defendant to spend resources preparing to address that non-issue.

A defendant is entitled to disclosure of "central facts" that will permit him to conduct his own investigation into the charges against him and to present a proper and adequate defense. *United States v. Vastola*, 670 F. Supp. 1244, 1270 (D.N.J. 1987); *United States v. Palmisano*, 273 F. Supp. 750, 752 (E.D. Pa. 1967) (Due Process requires that a defendant be given notice of the charges that is "distinct and specific as clearly to advise him what he has to meet, and to give him a fair and reasonable opportunity to prepare his defense").  Without knowing which statements the government intends to prove were false, and the respect in which those statements are alleged to be false, or what specific omissions are claimed and the source of the claimed duty to disclose, Mr. Bennett cannot prepare adequately to defend the charges against him at trial.

### b.  The Massive Volume of Discovery Heightens Defendant's Need for a Bill of Particulars

The government cannot claim that the voluminous discovery already provided obviates the need for a bill of particulars.  Courts have long recognized that "disclosure by the government of 'mountains of documents' is not an adequate substitute for a bill of particulars when the government's disclosure does not provide guidance regarding what it seeks to prove at trial." *United States v. Lacerda*, No. 12-cr-303 (NLH), 2013 WL 3146835, at *14 (D.N.J. June 19, 2013).  Indeed, voluminous production of documents by the government, without

11

specification of which documents contain false statements, only tends to aggravate the lack of notice and difficulties of trial preparation, and therefore weighs in favor of granting a bill of particulars. *See United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) ("[T]he large volume of material disclosed is precisely what necessitates a bill of particulars.").

The Second Circuit decision in *Bortnovsky* is instructive. In *Bortnovsky*, a mail fraud case, the defendants were charged with submission of false claims to insurance companies. The government turned over to the defense 4,000 documents but failed to specify which of the documents contained false statements. Reversing the conviction, the Second Circuit stated that the defendants

> were hindered in preparing for defense by the district court's failure to compel the government to reveal crucial information: the dates of the false burglaries and the identity of the three fraudulent documents. The government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified . . .

820 F.2d at 574.

The necessity of a bill of particulars is far stronger here. In *Bortnovsky*, the government produced 4,000 documents. The number of documents here – over 500,000 electronic documents plus millions of pages of hard copy documents thus far – is vastly higher. And, in *Bortnovsky*, the indictment specified the content of the alleged false statements, and the entity to which those false statements were made—statements to insurance companies that burglaries had occurred when in fact they had not occurred. *Id.* at 574; *see also United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (ordering bill of particulars over the government's objection in a case in which the government "produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2000 Medicare claims" but had not informed the defendants "which of these claims were false and in what way they were false").

12

Here, the indictment specifies neither the misrepresentations on which the fraud is based, nor who made those false statements, nor even whether the fraud is based on a misrepresentation at all, as opposed to an omission—all of which indisputably are essential to a defense of this case.  Indeed, in light of the complexity of the charges, the massive volume of discovery, and the lengthy time period encompassed by the charged conspiracy, it "smacks of gamesmanship" for the government to require a defendant "to waste precious pre-trial preparation time guessing which statements [he has] to defend against . . . when the government knows precisely the statements on which it intends to rely and can easily provide that information."  *Trie*, 21 F. Supp. 2d at 21.[6]

Accordingly, Mr. Bennett submits that the bill of particulars requested in this motion should be granted.

## I.    THE GOVERNMENT SHOULD BE DIRECTED TO MAKE IMMEDIATE DISCLOSURE OF *BRADY* MATERIAL

It is well settled that the government must produce *Brady* material at the earliest possible time during discovery.  Consistent with that rule, the Court's November 24, 2014 Order for Discovery and Inspection obligates the government to produce, by ten days from the date of the order, "Any material evidence favorable to the defense related to issues of guilt, lack of guilt or punishment, which is known or that by the exercise of due diligence may become known" to the government.  In defendant's February 2015 Discovery Request, counsel made a further formal request for production of *Brady* materials.  *See* Ex. C.

---

[6] The fact that the government has provided the transcripts of the trial of Gordon McDonald does not obviate the need for the particulars requested.  Mr. McDonald was charged with a far broader range of conduct than Mr. Bennett, including remediation sites and contracts that had nothing to do with Mr. Bennett.  Moreover, identifying the government's theory of fraud against Mr. McDonald, or the subset of activity at issue in that trial, does not identify the government's theory against Mr. Bennett.

Over seven months later, the government has not produced anything that it has characterized as *Brady* material, nor has it provided any specific response aside from repeated boilerplate representations that it "remains cognizant of its continuing obligations under . . . *Brady v. Maryland*, 474 U.S. 83 (1963), and will continue to produce discovery to you consistent with those obligations."  The government's actions and inactions over these seven months demonstrate beyond question that, in fact, the government is *not* "cognizant of its continuing obligations under . . . *Brady v. Maryland.*"  It does not recognize what actually constitutes *Brady* material, even when such material is specifically identified, nor has it undertaken an appropriate review of its files to identify and produce such material, to which Mr. Bennett is entitled under the Constitution.  The Court's intervention is required.

Based upon Defense counsel's independent review of sworn statements submitted by the government to Canadian authorities in connection with Mr. Bennett's extradition proceeding, which statements the government has *not produced* to the defense in discovery, it is apparent that the government is in possession of *Brady* material that has not been disclosed, including exculpatory oral statements of witnesses whom the government has interviewed.  In particular, in sworn statements by Special Agent Paul Brezinski of the EPA Office of the Inspector General, contained in the "Record of the Case" dated February 1, 2010, which was prepared by the DOJ and submitted to Canadian authorities, the government conceded that Robert Griffiths, its key cooperating witness, informed the government that he had never disclosed to Mr. Bennett that General Monitoring and Environmental Control Inc. ("GMEC") was a shell company controlled

14

by McDonald.[7]  *See* Ex. D at ¶ F ("McDonald admitted to Griffiths that GMEC was, in fact, his company.  Griffiths did not disclose this fact to Bennett or anyone else at BEI.").

Mr. Griffith's blunt denial that he ever told Mr. Bennett the truth about GMEC's ownership – and his admission that he concealed that fact from Mr. Bennett – is core *Brady* material, and it undermines a central feature of the government's case against Mr. Bennett.  In particular, the indictment alleges that the vast majority of the kickbacks to McDonald were paid via wire transfers to GMEC.  Those payments were made in connection with invoices from GMEC that appeared to reflect necessary and genuine soil-testing services performed in connection with the Federal Creosote site by a legitimate company with an innocuous-sounding name: General Monitoring and Environmental Control, Inc.  The heart of the government's case is that GMEC was in fact a sham company controlled by Mr. McDonald, which performed no actual services, and all payments to GMEC were bribes.  That Mr. Bennett was *not* told the truth about GMEC is plainly exculpatory and is of crucial importance to the defense.

After independently discovering this exculpatory fact, defense counsel expressly asked, by letter dated May 18, 2015, that the government immediately provide full disclosure regarding Mr. Griffiths' statements on this issue.  To date, the government has not produced any disclosure requested by our May 18, 2015 letter, nor produced any oral statements by any witnesses, nor informed the defense of the identities of any witnesses it has interviewed who made other exculpatory statements.  In a June 3, 2015 telephone conference, the government refused to accept that this exculpatory statement constitutes *Brady* material.  Nonetheless, the government agreed to review relevant information from FBI 302 reports and witness interviews, and provide

---

[7] Notably, at the trial of Mr. Bennett's co-defendant Gordon McDonald, Griffiths testified that he *did* tell Mr. Bennett that GMEC was controlled by McDonald.  Full disclosure of Mr. Griffiths' exculpatory statements to the government prior to trial is particularly important in light of Griffiths' inconsistent statements in sworn trial testimony.

that information to the defense. To date—more than six months after the deadline set by the Court's November 24, 2014 Order – the government has not conceded that it is in possession of *any Brady* material, nor has the government turned over any of Mr. Griffith's exculpatory statements on this issue.

The requirement that the prosecution disclose information favorable to the defense is a basic rule of fairness mandated by case law and the government's own guidelines. To permit defense counsel to effectively use such material in their case preparation and at trial, potentially favorable evidence must be disclosed at the outset of the case, or immediately upon discovery. *See United States v. Donis*, No. 11-cr-251, 2012 WL 3527277, at *1 (W.D. Pa. Aug. 15, 2012) ("[I]t is well settled that the government's obligations under Brady require it to disclose actual exculpatory evidence without undue delay."); *United States v. Lightfoot,* No. 08-cr-127, 2008 WL 3050300, at *1 (W.D. Pa. Aug. 5, 2005) (noting the Third Circuit's "adherence to the long-standing policy of promoting early production of all types of *Brady* material to ensure the effective administration of the criminal justice system," and ordering that "any exculpatory *Brady* evidence . . . shall be disclosed forthwith" upon its discovery by the government (emphasis added and internal quotation marks omitted)); *United States v. Thomas*, No. 06-cr-553, 2006 WL 3095956, at *1-2 (D.N.J. Oct. 30, 2006) (ordering the government to disclose, *inter alia*, *Brady* information, and to "advise[]" defense counsel "in writing of the declination" to disclose any such exculpatory information within 5 days of the discovery conference); *United States v. Crozzoli*, 698 F. Supp. 430, 436 (E.D.N.Y. 1988) ("To permit the prosecution to withhold exculpatory evidence despite a request until such time as the prosecutor chooses to disclose it, is to permit the prosecutor to control, to some extent, the preparation of a defense.").

The practice of producing potentially exculpatory information as soon as it is identified was reaffirmed in Deputy Attorney General Ogden's January 4, 2010 Memorandum Guidance for Prosecutors Regarding Criminal Discovery, which was issued in the wake of a number of high-profile federal cases, including the Ted Stevens prosecution, in which defendants were prejudiced by *Brady* violations.  The Ogden Memorandum instructs prosecutors that the Department of Justice's policy is to "err on the side of inclusiveness," to "provide[] for broader disclosures than required by *Brady* and *Giglio*," and that "exculpatory information, regardless of whether the information is memorialized, must be disclosed to the defendant reasonably promptly after discovery."[8]

Delays in the production of exculpatory and impeachment material have led the Third Circuit to repeatedly admonish government attorneys, noting that "such conduct is not in accordance with the high standard of professional conduct to which they should, indeed must, adhere."  *United States v. Pellot*, 43 F. App'x 473, 476 (3d Cir. 2002).  As the Third Circuit recently observed in *Breakiron v. Horn*, 642 F.3d 126, 133 n.8 (3d Cir. 2011) "[P]rosecutors, so long after *Brady* became law, still play games with justice and commit constitutional violations by secreting and/or withholding exculpatory evidence from the defense."  *See also United States v. Rittweger*, 524 F.3d 171, 182 (2d Cir. 2008) (admonishing government for not disclosing Brady material earlier than the week of trial, "particularly when earlier discovery would not have had the potential to harm the witness" and where the government produced 200 boxes of materials well before trial but "withheld until . . . the eve of trial [] the evidence that the government counsel surely should have known defense counsel was most interested in").

---

[8]  *See* David W. Ogden, Deputy Attorney General, U.S. Dep't of Justice, Memorandum for Department Prosecutors: Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), *available at* http://www.justice.gov/dag/memorandum-department-prosecutors.

The government's failure to immediately disclose Mr. Griffiths' exculpatory statements to the defense is unjustifiable. Its refusal to recognize that this information is *Brady* material evidences a fundamental lack of understanding of the meaning of *Brady*, that unfortunately, despite the lessons of *Stevens* and other cases and the adoption of the Ogden memo, is not as uncommon as it should be. It is deeply troubling.

The defense is cognizant that courts often accept the government's boilerplate representation that it "is aware and will comply" with *Brady*, and on that basis, deny as moot a motion by defense counsel for disclosure of *Brady* material. Given that seven months after Mr. Bennett's first appearance in this case, the government has still not disclosed any *Brady* material or even conducted a search for such material – contrary to this Court's prior directive – and has continued to refuse to recognize that Mr. Griffith's obviously exculpatory statements implicate *Brady*, the Court cannot simply rely on the government's hollow assurances. Rather, the government should be admonished and ordered immediately to comply with its *Brady* obligations and with this Court's November 24, 2014 Order, by conducting a review of its entire file to identify, and then to turn over to the defense, all exculpatory material, including summaries of Mr. Griffiths' exculpatory statements regarding his nondisclosure to Mr. Bennett of McDonald's interest in GMEC, and any other exculpatory oral witness statements or other material, to ensure that Mr. Bennett's Constitutional rights to due process and a fair trial are protected.

## CONCLUSION

For all of the foregoing reasons, we request that the Court grant the relief requested herein.

Dated: New York, New York
    June *8*, 2015

                                    MORVILLO, ABRAMOWITZ, GRAND,
                                        IASON & ANELLO, P.C.

                                    By: _____
                                        Robert J. Anello
                                        Richard F. Albert
                                        Jacob W. Mermelstein
                                        Peter Janowski
                                    565 Fifth Avenue
                                    New York, NY 10017
                                    (212) 856-9600